1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARK C. BARNUM,

11             Petitioner,                    No. CIV S-03-1385 LKK JFM P

12         vs.

13   CALDERON, Warden, et al.,

14             Respondents.              FINDINGS AND RECOMMENDATIONS

15   _____/

16             Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction on

18   charges of battery by an inmate on a correctional officer.  Following the conviction, petitioner

19   was sentenced to twenty-five years to life in prison under California's Three Strikes Law.

20             Petitioner raises five claims in his petition.  First, he claims that his constitutional

21   rights were violated because the trial was held on the grounds of a state prison.  In his first claim,

22   petitioner also claims that the trial court had a duty to give cautionary instructions *sua sponte*,

23   and that the denial of two pretrial motions and other cumulative errors violated his right to due

24   process.  Second, he claims that his rights under the Fifth Amendment were violated by the trial

25   court's failure to advise petitioner of his right not to testify.  Third, he claims that his

26   constitutional rights were violated by the trial court's failure to remove petitioner's court-

1

appointed attorney.  Fourth, he claims that his right to due process was violated by the trial

court's refusal to review certain discovery material *in camera*.  Finally, petitioner claims that his

constitutional rights were violated by prosecutorial misconduct.

Respondents contend that petitioner's first three claims are without merit.

Respondents contend that petitioner's fourth and fifth claims for relief are unexhausted but that

those claims "can and should be" denied.  (Answer to Petition for Writ of Habeas Corpus, filed

December 23, 2003, at 3.)  Respondents also contend that the fourth claim for relief is not a

cognizable federal claim and that the fifth claim is barred by the doctrine of procedural default.

## FACTS[1]

The main issue at trial was whether guards acted properly when
they took [petitioner] from his cell, or acted with excessive force,
which gave [petitioner] and his cellmate the right to defend
themselves.  The cellmate pleaded guilty.

Officers John Cartier and Richard Eubanks had recently been
assigned to the building in which [petitioner] was housed and the
prior guards had not regularly inspected the cells for contraband.
Cartier and Eubanks began searching several cells each evening
after dinner, sweeping the building clean, so they could then
institute regular, random, cell searches.  On July 19, 1997, they
selected the cell shared by [petitioner] and inmate Hendricks.
[Petitioner] had a reputation as a hothead, so they called Officer
Lorenzo Abella from another building.  After the officers got
[petitioner] and Hendricks out of the cell, [petitioner] began
swearing.  He approached Cartier, who put his hand up to keep
[petitioner] at bay.  [Petitioner] "moved in" to Cartier's hand, then
slapped it away.  When Cartier tried to handcuff [petitioner], a
fight erupted in which Cartier's throat was scratched and Abella's
head was slammed into a rail, after which [petitioner] and
Hendricks pummeled Abella's back until Eubanks sprayed them
with a chemical.

[Petitioner] elicited from a sergeant that Abella, apparently, left
his post to assist the search, and showed the officer who
investigated the matter did not interview any inmates.  He elicited
testimony from prisoners (including himself) that, if believed,
showed his cell was selected in retaliation for a squabble which

---

[1]  The statement of facts is taken from the opinion of the California Court of Appeal for
the Third Appellate District in People v. Barnum, No. C031302 (Jan. 29, 2001), a copy of which
is attached as Exhibit D to Respondents' Answer.

occurred during dinner, in which a guard belittled a dead rap music artist and, in reply, a prisoner belittled John Wayne.  Some claimed the guards employed excessive force.

The prosecution impeached the prisoners with their prior convictions and pointed out implausibilities in their stories.

The jury returned the following note:  "We, the Jury believe that Mr. Mark Barnum is guilty on both counts.  However, we also believe that the events were precip[it]ated by improper handling of prec[eding] events and could have been prevented by the following of proper established protocols.

(People v. Barnum, slip op. at 2-3.)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

1   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

2   simply because that court concludes in its independent judgment that the relevant state-court

3   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

4   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

5   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

6   question, is left with a 'firm conviction' that the state court was 'erroneous.'")

7            The court looks to the last reasoned state court decision as the basis for the state

8   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

9   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

10  habeas court independently reviews the record to determine whether habeas corpus relief is

11  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

12  II.  Petitioner's Claims

13       A.  Trial Held at State Prison

14           Petitioner first claims that his constitutional rights were violated because the trial

15  was held on the grounds of a state prison.  Petitioner also contends that the trial court erred in not

16  giving "cautionary instructions" concerning the location of the trial.[2]

17           The last reasoned state court rejection of these contentions is the decision of the

18  California Court of Appeal for the Third Appellate District:

19           [Petitioner] does not show prejudice.  "No judgment shall be set
             aside . . . for any error as to any matter of pleading, or for any error
20           as to any matter of procedure, unless, after an examination of the
             entire cause, including the evidence, the court shall be of the
21           opinion that the error complained of has resulted in a miscarriage
             of justice."  (Cal. Const., art. VI, § 13.)

22  /////

23

24       [2]  Petitioner also contends generally that the trial court erred in denying his Marsden and
    Pitchess motions, and that accumulation of trial errors violated his right to due process.  The first
25  contention is also raised as petitioner's third claim for relief and will be addressed in section IIC
    of these findings and recommendations.  Petitioner has not shown that the other two contentions
26  support his claim for federal habeas corpus relief.

This case presented a credibility contest, centered on whether the guards acted lawfully or provoked the inmates. The location of the trial did not necessarily change anything. The jury was going to learn [petitioner] was an inmate.

Counsel presents several snippets from the relevant section of the California Standards of Judicial Administration in an effort to bolster his case. However, when the full section is consulted, it does not aid [petitioner].

[The appellate court] set out the relevant section in full:

"(a)  Facilities used regularly for judicial proceedings should not be located on the grounds of or immediately adjacent to a state penal institution unless the location, design and setting of the court facility provide adequate protection against the possible adverse influence that the prison facilities and activities might have upon the fairness of judicial proceedings.  In determining whether adequate protection is provided, the following factors should be considered:  (1) the physical and visual remoteness of the court facility from the facilities and activities of the prison; (2) the location and appearance of the court facility with respect to the adjacent public areas through which jurors and witnesses would normally travel in going to and from the court; (3) the accessibility of the facility to the press and the general public; and (4) any other factors that might affect the fairness of the judicial proceedings.  "(b) Unless the location, design and setting of the facility for conducting court sessions meet the criteria established in subdivision (a):  (1) court sessions should not be conducted in or immediately adjacent to a state penal institution except for compelling reasons of safety or convenience of the court, and (2) should not be conducted at such a location in any event when the trial is by jury, or when the testimony of witnesses who are neither inmates nor employees of the institution will be required."  (Cal. Stds. of Jud. Admin., § 7.5 (hereafter § 7.5).)

The Judicial Council has not expressed a preference that prisons not be used as courthouses, only that adequate safeguards be employed when they are so used.  Because we presume official duty is performed (Evid. Code, § 664), and because the record does not demonstrate otherwise, we presume all proper steps were taken in accordance with section 7.5, including ensuring accessibility to the

public and press and ensuring "the location, design
and setting of the court facility provide adequate
protection against the possible adverse influence
that the prison facilities might have upon the
fairness of judicial proceedings."

Counsel states the trial court ruled the trial would not be in the
prison, but then mysteriously and off the record changed its mind.
The record citation supplied in support of this assertion is to a
pretrial hearing brought in multiple cases, regarding the policy of
denying contact attorney visits to prisoners in administrative
segregation.  The court denied the motion, but did order "private
consultation."  The court went on, in an aside, and stated "as I said,
I sympathize with counsel.  I realize I'm not dealing with an
unusual situation, even though we are here hearing this hearing on
the grounds of High Desert State Prison, and [in] many cases, that
will be deemed prejudicial itself, we will not have a trial here.  [¶]
But under the circumstances, that will be the ruling, [on visits]."
The court did *not* rule "we will not have a trial here," meaning, in
this case.  The court was saying that in "many cases, that will be
deemed prejudicial itself," and *in such cases* "we will not have a
trial" in the prison.

[The appellate court] granted [petitioner's] request for judicial
notice of an order of the Presiding Judge of the Lassen County
Superior Court.  It states:  "Upon the application of the Superior
Court, the Judicial Counsel and Administrative Office of the
Courts of the State of California have found justified the
assignment of a judge to the court to preside over 'Three Strikes'
trials as assigned by this court; and this court has found it in the
public interest to provide for a regular extra session of the Superior
Court for [t]his purpose as authorized by law (Government Code
69790])."  These sessions are to be known as Department Five,
"to which are apportioned the criminal cases pending before the
court, commonly known as 'strike' cases, which arise from alleged
acts occurring in a facility of the State Department of Corrections
in Lassen County."  Such cases are to be heard either "at the court
facility located on the grounds of High Desert State Prison
(Government Code sections 69741(b) and 69792,) or, as the same
may be available and directed by the Presiding Judge, the main
Courthouse in the City of Susanville."

Only "strike" cases are subject to this rule, and they are the cases
posing the greatest security threats, as a class.  On its face the order
does not state that *all* such cases are to be heard in prison.  If a
defendant can articulate prejudice to his case, presumably the trial
court will not employ this rule, or at least the defendant will have
made a record of the problem, thus preserving it for appellate
review.  [Petitioner] did neither.

/////

6

To the extent we interpret [petitioner's] brief as making an argument for *per se* reversal whenever a trial is conducted on prison grounds, the authorities cited in support of such claim do not withstand scrutiny.  As the trial court indicated in the ruling just discussed, it is *sometimes*, but not always, prejudicial to conduct a trial on prison grounds.  Therefore each case must be considered on its facts.  For the reasons stated above, [the appellate court] assume[s] all reasonable steps to minimize any unfairness were taken in this case, therefore [petitioner's] claim fails.  [The appellate court] briefly discuss[es] some of the authorities mentioned by counsel, to refute the claim of a "per se" rule of prejudice.

Another panel of [the California Court of Appeal] . . . rejected an attack on the practice of holding certain trials within the confines of the Susanville prison.  (See *People v. England* (2000) 83 Cal.App.4th 772.)  [The appellate court] generally agree[s] with that decision.

Other courts have considered this issue, often focusing on public access to the trial.  (E.g., *Bright v. State* (Ct.App. Alaska 1994) 875 P.2d 100, 102-105, 107-110 [over objection, assault case held in prison, no showing of compelling reasons, federal and state right to public trial violated]; *Vescuso v. Commonwealth* (1987) 5 Va.App. 59, 68-69 . . . [no categorical ban on prison trials, but presumption is they deny public access]; see Annot., Exclusion of Public from State Criminal Trial by Conducting Trial or Part Thereof at Other than Regular Place or Time (1989) 70 A.L.R.4th 632; Annot., Place of Holding Sessions of Trial Court as Affecting Validity of its Proceedings (1968) 18 A.L.R. 3d 572.)  As stated above, for lack of a record showing otherwise, [the appellate court] presume[s] the public and press had reasonable means of attending trial.  (See § 7.5(a); see also *People v. England, supra,* 83 Cal.App.4th at pp. 778-779.)

[Petitioner] analogizes to cases of unnecessary shackling of a prisoner, or dressing a prisoner in jail clothing, which may unfairly convey to the jury the suggestion the accused is dangerous and, hence, probably guilty.  In a Virginia case, the accused claimed holding his trial in the prison created an atmosphere that implicitly communicated his dangerousness and guilt to the jurors.  The accused had asked that the trial *not* take place in the prison, and the record contained a description of the trial surroundings, including a view of "gun towers, bayonet wire, bars, and security fences;" however, the Virginia Court of Appeals concluded "the trial location did not erode Howard's right to a presumption of innocence."  (*Howard v. Commonwealth* (1988) 6 Va.App. 132, 137-140 . . . (*Howard*).)  The analysis focused on the precise layout of the courtroom and prison which is not described in this record.

/////

[Petitioner's] primary authority is *State v. Lane* (1979) 60 Ohio St.2d 112 . . ., but the case is inapposite: "In [*Lane*], the court found that the defendants were denied a fair trial because they were tried in a makeshift courtroom located within the prison itself, where the jurors had a 'constant view of the scene of the alleged offense [escape].' [Citation.] Further, the court found that the right of the defendant to call witnesses was chilled by the location of the trial and cited the fact that several inmate witnesses had refused to testify in the penitentiary courtroom for fear of reprisal by prison officials." (*Howard, supra*, 6 Va.App. at pp. 139-140. . . . None of the prejudicial points in *Lane* are present.

Lest it appear we are burying our heads in the sand, [the appellate court] point[s] out, as other courts have repeatedly explained, that our system of laws depends upon the assumption that jurors are intelligent. (See *People v. Powell* (1960) 186 Cal.App.2d 54, 59.) "A juror is not some kind of dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box." (*People v. Long* (1974) 38 Cal.App.3d 680, 689.) At most, given the inmate-witnesses were in the highest security status (level IV, administrative segregation) the jury undoubtedly (and correctly) concluded an in-prison trial was just standard operating procedure, having no particular application to [petitioner]. Lassen County is not very large and the prisons there are among the largest local operations. Very likely the practice of in-prison trials is widely known and understood among the populace. In fact, [petitioner] was not visibly shackled in this case and the trial judge commended him for being such a gentleman at trial, despite the view of the guards that he was a dangerous hothead. [The appellate court] decline[s] to infer the jury would likely conclude [petitioner] was guilty because the trial occurred inside a state prison, thereby disregarding their instructions and common sense. Moreover, the jurors reacted favorably to [petitioner] as shown by the gratuitous appendage to their verdict.

Two recent California Supreme Court cases are instructive. In *People v. Jenkins* (2000) 22 Cal.4th 900, [petitioner] claimed the trial court should not have installed a metal detector at the courtroom door. The court (at page 996) distinguished measures which mark *the defendant* as dangerous: "Unlike shackling and the display of the defendant in jail garb, the use of a metal detector does not identify the defendant as a person apart or as worthy of fear and suspicion." In another case the court pointed out "To the extent the metal detector's use focused attention on the proceedings, it pointed to the nature of the case, not to defendant's character." (*People v. Ayala* (2000) 23 Cal.4th 225, 252.) The location of trial did not mark [petitioner]. For this reason, no hearing was required on the issue. (*People v. Jenkins, supra*, 22 Cal.4th at p. 997 [see citation omitted].

1        . . .

2               Finally, [the appellate court] observe[s] that an in-prison trial can
         benefit a defendant who would otherwise have to be shackled.  The
3        probation report reflects [petitioner] has a violent history, including
         violence towards officers, convictions for dissuading witnesses,
4        and racially motivated threats.  In response to the motion for a
         contact visit, Associate Warden Salvatore Mennuti filed a
5        declaration stating most of the inmates at High Desert State Prison
         are level IV inmates, who "are assigned to only the most secure
6        facilities with the greatest amount of armed coverage.  Level IV
         inmates require a greater amount of supervision than other inmates
7        since they present a higher risk of violence or escape."  But even
         within this set of dangerous inmates there exists those, such as
8        [petitioner], who are housed in an administrative segregation unit
         (ASU), which "is made up primarily of Level IV inmates who have
9        been segregated from other Level IV inmates because they pose a
         threat to the security of [the] institution."  (See *Small v. Superior*
10       *Court* (2000) 79 Cal.App.4th 1000, 1005.)  As the trial date
         approached, a security officer who had witnessed [petitioner's] in-
11       court behavior recommended the use of "a stun-belt for the safety
         of the public and the court staff."

12
               [Petitioner] was a prime candidate for shackling, both because of
13       his status as an ASU inmate and given the particulars of his history
         of disobedience and violence against those in authority.  The trial
14       court ruled no stun belt or visible shackles were to be used.  Had
         the trial been conducted in Susanville, instead of in the prison,
15       [petitioner's] flight and violence risks would have been weighed
         quite differently.

16
               This illustrates that the selective use of in-prison trials is
17       beneficial to the State, the taxpayer and, in some cases, the
         defendant.  It is not an inherently prejudicial practice.

18

19       (People v. Barnum, slip op. at 4-13.)

20               The trial court addressed the issue of holding the trial on prison grounds only in

21       the context of what the jurors could not bring to court, after prompting by the prosecution's

22       comment that jurors were allowed to wear jeans on prison grounds.  (RT 59.)  The trial court

23       advised the jurors they would get a break for lunch, at which time they could leave prison

24       grounds.  (RT 59-60.)

25               Neither party has provided Supreme Court authority for the proposition that

26       holding criminal trials on state prison grounds does or does not violate a defendant's right to a

                                                9

fair trial, and this court has found none.  However, the United States Supreme Court has held that "certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial.  Estelle v. Williams, 425 U.S. 501, 503-06. . .(1976); Holbrook v. Flynn, 475 U.S. 560, 568 . . . (1986)."  See Carey v. Musladin, ____ U.S. ____, 127 S.Ct. 649, 651 (2006).  Both Estelle and Holbrook "addressed the effect of [state-sponsored][3] courtroom practices on defendants' fair-trial rights."  Carey, 127 S.Ct. at 653.

The Estelle court found that "the State cannot, consistent[] with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes."  Id., 425 U.S. at 512.  However, the Estelle court held Estelle failed to object at trial, thus waiving any objection to being tried while dressed in prison garb.  Id. 425 U.S. at 512-13. The Holbrook court also found that the presence of four uniformed state troopers in the row of spectators' seats behind Holbrook at trial was not so inherently prejudicial that it denied Holbrook a fair trial.  Id., 475 U.S. at 571.

"All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to [a] defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Holbrook, 475 U.S. at 572.  Courts use "reason, principle, and common human experience" to determine whether a practice is presumptively prejudicial.  Holbrook, 475 U.S. at 569.  "The question must be . . . whether 'an unacceptable risk is presented of impermissible factors coming into play.'"  Id., 475 U.S. at 570 (quoting Estelle, 425 U.S. at 505.)

In some cases, holding a criminal trial at a state prison would be inherently prejudicial.  Usually trials are held in courthouses or facilities where proceedings may take place in a dignified and neutral surrounding with access to the public and the press.  However, in the

---

[3]  The Carey court was faced with private-actor courtroom conduct rather than state-sponsored courtroom practices (spectators wearing buttons bearing the victim's photo).

1  instant case, petitioner was charged with battery of a correctional officer; as such, the jury was

2  going to find out that petitioner was in prison at the time of the offense.  Petitioner was not

3  shackled during the trial (RT 9), and the trial court denied the prosecution's request to have a

4  stun belt placed on petitioner for the safety of the public and the court staff (RT 8).  Petitioner

5  has not identified anything specific about having the trial on prison grounds that deprived him of

6  a fair trial.  Petitioner has failed to demonstrate he suffered prejudice simply because the trial was

7  held in a building on the grounds of High Desert State Prison.  Although it is possible that a juror

8  might have inferred something from the fact the trial was being held at the prison, it is also

9  possible that jurors believed the trial was held at the prison because most of the witnesses either

10  worked or were housed at the prison.  It is also possible the jurors inferred nothing from the

11  practice at all.  Holbrook, 475 U.S. at 569.  On this record, the court cannot find that holding the

12  trial on prison grounds deprived petitioner of a fair trial.  Moreover, the state court's denial of

13  this claim was not contrary to, or an  unreasonable application of, clearly established Federal law.

14  This claim should be denied.

15          Petitioner also claims that the trial court had a duty to give cautionary instructions

16  *sua sponte*; that is, the trial court was required to admonish the jury not to infer anything by the

17  fact the trial was held on prison grounds.

18          The state court rejected this argument:

19          For the same reasons, the court had no duty to instruct the jury on
        its own motion not to infer anything about guilt due to the location
20        of the trial.  [Petitioner] likens the problem to the need to instruct
        jurors not to visit crime scenes, but the analogy is weak.  The
21        standard instructions focus the jury's attention on the facts of the
        alleged crime.  "[I]t is a fundamental and historic precept of our
22        judicial system that jurors are restricted solely to the determination
        of factual questions and are bound by the law as given them by the
23        court[.]"  (*Noll v. Lee* (1963) 221 Cal.App.2d 81, 87, original
        italices.)  There is no basis to infer [petitioner] was convicted
24        because the trial occurred inside a state prison; instead, the
        evidence showed he was guilty.  If [petitioner] wanted an
25        instruction on the point, he should have requested one.

26  (People v. Barnum, slip op. at 11-12.)

1          A challenge to jury instructions does not generally state a federal constitutional

2   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021

3   (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

4   1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or

5   application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805,

6   814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a

7   "claim of error based upon a right not specifically guaranteed by the Constitution may

8   nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire

9   trial that the resulting conviction violates the defendant's right to due process."  Hines v.

10  Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

11  1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236

12  (1941).  To prevail, petitioner must demonstrate that the instructional error "'so infected the

13  entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62,

14  72 (1991) (quoting Cupp, 414 U.S. at 147).  Petitioner's burden is "especially heavy" when the

15  court fails to give an instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

16         After review of the record herein, this court finds that the failure to instruct the

17  jury with admonishments concerning the trial's location did not render petitioner's trial

18  fundamentally unfair.  The state court of appeal's rejection of this claim was neither contrary to,

19  nor an unreasonable application of applicable principles of federal law.  This claim for relief

20  should be denied.

21      B.  Fifth Amendment Rights

22         Petitioner claims that his rights under the Fifth Amendment were violated by the

23  trial court's failure to advise petitioner of his right not to testify.

24         The California Supreme Court granted review of this claim alone, and fairly

25  summarized the pertinent facts as follows:

26  /////

During jury selection, [petitioner] made a motion, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, asking the trial court to relieve appointed counsel and to substitute other counsel. After a hearing in chambers, the trial court denied [petitioner's] motion. Relying in effect on *Faretta*, [petitioner] then made a motion seeking to represent himself.[4] During the pendency of his *Faretta* motion, [petitioner] renewed his *Marsden* motion. After a hearing in chambers, the trial court denied [petitioner's] renewed *Marsden* motion. Then, after a hearing in open court, and in spite of its "high suspicion" that [petitioner's] "effort in this case ha[d] been solely to delay and to obstruct this trial," the trial court granted [petitioner's] *Faretta* motion, having determined that he knowingly, intelligently, and voluntarily chose to forgo the assistance of counsel. Making plain the dangers and disadvantages of self-representation, the trial court warned [petitioner] that it was "not going to be able to assist [him] or advise [him] on matters of law, evidence, or trial practice." [Petitioner] acknowledged the trial court's warning, responding, "That is true," and nevertheless chose to continue to seek to represent himself. The trial court relieved appointed counsel, whom it then appointed as standby counsel.

. . .

In his defense, [petitioner] presented a different version of the encounter and of the events leading up to it. [Petitioner] testified on his own behalf, without advisement by the trial court of his privilege against compelled self-incrimination. In direct examination in the form of narrative, [petitioner] described an incident at dinner on the day in question: Along with other inmates, [petitioner] and Hendricks were engaged in a discussion about the late rap music artist Tupac Shakur. Cartier interjected that Shakur was "six feet deep" where he belonged, and Hendricks replied that John Wayne was "six feet deep" where *he* belonged. Not long thereafter, as Eubanks and Abella attempted to bring dinner to an end and met with resistance, Eubanks said, "We'll be up . . . to your cell. We will see how tough you are." When Carter and Eubanks arrived, Cartier confronted [petitioner] and pushed him hard, and [petitioner] responded in self-defense. On cross-examination, the prosecutor sought to impeach [petitioner] by probing into the events in question and by obtaining an admission that he had suffered the four prior felony convictions alleged against him. [Petitioner] also called a number of inmates whose testimony largely supported his, including Hendricks, who had pleaded guilty to similar charges arising out of the same events. In addition, [petitioner] called Sergeant Richard Berry, who testified that Cartier, Eubanks, and Abella failed to follow proper procedures in conducting the cell search.

---

[4]   <u>Faretta v. California</u>, 422 U.S. 806 (1975).

1    In rebuttal, the People called [petitioner] as a witness, again
     without advisement by the trial court of his privilege against
2    compelled self-incrimination, and [petitioner] took the stand.  The
     prosecutor sought to impeach [petitioner] by probing into prior
3    incidents involving correctional officers at another prison.  In
     narrative form, [petitioner] gave his own version of what had
4    happened in the course of those incidents.

5    After deliberations, the jury returned verdicts finding [petitioner]
     guilty of battery on a nonimate and obstruction of an executive
6    officer, and made findings that he had suffered four prior felony
     convictions.  In doing so, however, the jury delivered the following
7    note:  "We, the Jury, believe that [petitioner] is guilty on both
     counts.  However, we also believe that the events were precipated
8    [sic] by improper handling of preceeding [sic] events and could
     have been prevented by the following of proper established
9    protocols."

10   People v. Barnum, Case No. S095872  at 3-5 (Mar.17, 2003).[5]  The California Supreme Court

11   noted that the state Court of Appeal rejected the Killpatrick-Kramer rule[6] in light of Faretta v.

12   California, 422 U.S. 806, 821 (1975), and found that any violation of the rule in this case was

13   harmless beyond a reasonable doubt.  People v. Barnum, Case No. S095872  at 6 (Mar.17, 2003).

14   After lengthy analysis and consideration of Faretta,[7] the California Supreme Court ultimately

15   rejected the Killpatrick-Kramer rule.  People v. Barnum, Case No. S095872 at 17  (Mar.17,

16   2003).  However, the Court noted that although a trial court was "not required to advise a self-

17   represented defendant of the privilege against compelled self-incrimination" (id. at 18) it was not

18   precluded from doing so in the future.  (Id.)

19   /////

20   _____

21        [5]   The opinion of the California Supreme Court in People v. Barnum, No. S095872
     (Mar. 17, 2003), is attached as Exhibit J to Respondents' Answer.

22        [6]  This is a shorthand reference to Killpatrick v. Superior Court, 153 Cal.App.2d 146
23   (1957) and People v. Kramer, 227 Cal.App.2d 199 (1964), "declaring that a trial court is required
     to advise a defendant who represents himself . . . of the privilege against compelled self-
     incrimination before such a defendant is called by the People as a witness in their case-in-chief or
24   testifies in his . . . own defense."  People v. Barnum, Case No. S095872 at 1 (Mar. 17, 2003).

25        [7]  Faretta "does not require a trial court to treat a self-represented defendant differently
     from a defendant represented by counsel but, quite to the contrary, allows similar treatment."
26   People v. Barnum, Case No. S095872 (Mar. 17 2003).

1    The California Supreme Court then turned to the case at bar and affirmed the

2 decision of the trial court.  (Id.)  The Court stated that "prior to granting [petitioner's] *Faretta*

3 motion, the trial court warned [petitioner] that it was 'not going to be able to assist [him] or

4 advise [him] on matters of law, evidence, or trial practice,' and [petitioner] acknowledged the

5 warning, responding, "That is true."  (Id.)  Thus, the Court reasoned, petitioner "could not

6 reasonably have expected the trial court to advise him of any of his rights, including his privilege

7 against compelled self-incrimination."  (Id.)  Moreover, the Court agreed that the record reflected

8 petitioner freely took the stand in his own defense and when called by the prosecution in rebuttal,

9 petitioner "made absolutely no objection to testifying, and indeed betrayed not the least

10 hesitation.  We therefore cannot find any compulsion, either in law or in fact, in his action."[8]  (Id.

11 at 19.)

12    The Fifth Amendment guarantees an individual's right to refuse to testify at his

13 trial.  As a criminal defendant, petitioner also has the right to testify on his own behalf under the

14 Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth

15

16    [8]  Clearly, by testifying in his own defense, [petitioner] relinquished his privilege against compelled self-incrimination with respect to cross-examination on matters within the scope of the narrative testimony he provided on direct examination, as well as on matters that impeached

17 his credibility as a witness.  [Citations omitted.]  That is true even though [petitioner] represented himself.  (See *Powers, supra,* 223 U.S. at p. 314 [speaking of the privilege under the Fifth

18 Amendment in the context of a preliminary hearing].)  [The Court is] satisfied from [its] examination of the record that the permissibly wide scope of cross-examination was not

19 exceeded by the prosecutor's probing into the incident involving Correctional Officers Cartier, Eubanks, and Abella at High Desert State Prison, or by the prosecutor's obtaining an admission

20 that [petitioner] had suffered four prior felony convictions.
   It is true that the People called [petitioner] as a witness in their rebuttal.  But in the

21 People's rebuttal, the prosecutor, in effect, merely subjected [petitioner] to reopened cross-examination (see Evid. Code §§ 761, 778) or recross-examination (see *id.*, § 763; Cal. Law

22 Revision Com. com, 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 763, p. 53), doing little more than what he properly did on the initial cross-examination of [petitioner] in the course of

23 the defense, which was to impeach [petitioner's] credibility by probing into prior incidents involving correctional officers at another prison.  We recognize that a "defendant in a criminal

24 action . . . may not . . . be examined under direct examination by another party""without his [or her] consent."  (Evid. Code, § 772, subd. (d); see *id.*, § 776, subd. (a) [providing that "[a] party to

25 the record of *any civil action* . . . may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the

26 witness" (italics added)].)  [The Court finds] such consent implied, if not expressed, in this case.

1    Amendment and the Fifth Amendment's privileges against self-incrimination.  See Rock v.

2    Arkansas, 483 U.S. 44, 51-53 (1987); United States v. Edwards, 897 F.2d 445, 446-47 (9th Cir.),

3    cert. denied, 498 U.S. 1000 (1990).  However, petitioner's right to testify is not an unqualified

4    one.  The United States Supreme Court has held that, "even the defendant may not testify without

5    being subjected to cross-examination."  Taylor v. Illinois, 484 U.S. 400, 412 (1988).

6              In Faretta, the United States Supreme Court held that an accused has a Sixth

7    Amendment right to conduct his own defense, provided only that he knowingly and intelligently

8    forgoes his right to counsel and that he is able and willing to abide by rules of procedure and

9    courtroom protocol.  Faretta v. California, 422 U.S. 806, 821 (1975).  The holding of Faretta is

10   based on "the long-standing recognition of a right of self-representation in federal and most state

11   courts, and on the language, structure, and spirit of the Sixth Amendment."  McKaskle v.

12   Wiggins, 465 U.S. 168, 174 (1984).  Pursuant to that Amendment, "it is the accused, not counsel,

13   who must be 'informed of the nature and cause of the accusation,' who has the right to confront

14   witnesses, and who must be accorded 'compulsory process for obtaining witnesses in his favor.'"

15   Id.

16            The trial court did not give petitioner a Fifth Amendment admonition before

17   petitioner took the stand, either in his own defense, or when called back to the stand on rebuttal.

18   (RT 161-62.)

19            First, petitioner willingly and voluntarily chose to proceed in pro per.  Petitioner

20   was appropriately admonished, and recognized, that by doing so he was foregoing further legal

21   advice and assistance.  See Faretta, 422 U.S. at 835.  Then, petitioner willingly and voluntarily

22   took the stand in his own defense.  Petitioner thus forfeited  his privilege against self-

23   incrimination by voluntarily taking the stand in his own defense.  "'No procedural principle is

24   more familiar to this Court than that a constitutional right,'" or a right of any other sort, 'may be

25   forfeited in criminal as well as civil cases by the failure to make timely assertion of the right

26   before a tribunal having jurisdiction to determine it.'  Yakus v. United States, 321 U.S. 414, 444

                                             16

1    . . . (1944)." See U.S. v. Olano, 507 U.S. 725 (1993)(mere presence of alternate jurors in jury

2    room during deliberation was not prejudicial).  The prosecution called petitioner back to the

3    stand for rebuttal testimony.  Because petitioner had voluntarily taken the stand in his own

4    defense, the prosecution was entitled to cross-examine petitioner as well as to call him back to

5    the stand for rebuttal.  The prosecution did not call petitioner as a witness in its case-in-chief,

6    "but only in their rebuttal, and then only for what in effect was reopened cross-examination or

7    recross-examination."  People v. Barnum, S095872 at 20 n.4 (March 18, 2003).  As the state

8    Court of Appeal explained:

9               [Petitioner's] only practical hope of success was to take the stand.
             The defense was self-defense.  Although, as counsel pointed out at
10            oral argument, it is theoretically possible for a defendant to succeed
             on such a claim without taking the stand, in the circumstances of
11            this case that tactic would not succeed.  The testimony of the
             guards was against him, although there were some minor
12            discrepancies, and the other defense witnesses, apart from being
             felons and inmates with obvious motives to lie, had dubitable
13            perches from which to observe the events.  [Petitioner] was at
             times eloquent, and invited the jury to consider the realities of
14            prison life, the inevitable personality conflicts, and the practical
             inability of prisoners to obtain redress from abuse.  Nothing
15            particularly damaging came out in cross-examination.  Three
             incidents of [petitioner's] alleged resistance to or batteries on
16            officers did come in, but the incidents were minor and did not
             subtract from the force of [petitioner's] story which was
17            compelling enough to induce the jury to deliver a written
             admonishment of the conduct of the guards.  In fact, these
18            instances bolstered the theory the guards were biased against him.
             [Petitioner] not only fleshed out his side of the struggle, which the
19            other inmates could only do imperfectly at best, he was able to
             provide a plausible motive for the guards to go after him, namely,
20            to defend the honor of John Wayne.

21   (People v. Barnum, slip op. at 23-24.)

22            After review of the record, this court cannot find that petitioner was compelled to

23   testify in violation of the Fifth Amendment.  Moreover, given petitioner's criminal history, it is

24   likely he was familiar with Miranda, and, having at least one prior criminal trial,[9] would be aware

25   ────────────────

26        [9]  After jury trial, petitioner was found guilty of three counts of second degree robbery
     and two counts of dissuading witness on June 17, 1994.  (CT at 391.)  Petitioner also served

1  that he had the right not to take the stand in his criminal trial.  (Clerk's Transcript at 381, 391.)

2  The state court's denial of this claim was not contrary to nor an unreasonable application of

3  clearly established federal law.  Petitioner's second claim should be denied.

4       C.  Failure to Remove Petitioner's Court-Appointed Attorney

5            Petitioner claims that his constitutional rights were violated by the trial court's

6  failure to remove petitioner's court-appointed attorney, which implicated petitioner's right to

7  effective assistance of counsel.  People v. Marsden, 2 Cal. 3d 118 (1970).[10]

8            The California Court of Appeal fairly summarized the pertinent facts as follows:

9            The complaint was filed on December 10, 1997, and shortly
          thereafter attorney Thomas Buckwalter was appointed to represent
10        [petitioner].  Buckwalter represented [petitioner] at the preliminary
          hearing, and his request for funds to hire an investigator (for 20
11        hours) was granted.

12           On the scheduled date of trial, March 24, 1998, counsel argued
          motions.  In the middle of jury selection, [petitioner] made and lost
13        a Marsden motion.  The motion (argued in camera) was based on
          [petitioner's] view Buckwalter did not have "his whole heart" in
14        this case, was drinking and was incompetent.  The court invited
          Buckwalter to respond, and he presented a declaration from the
15        investigator, detailing the difficulties of communicating privately
          with prisoners in ASU, and indicating his investigator had tried to
16        talk to the only witness identified by [petitioner].  [Petitioner]
          stated there was a "whole tier full of cells" which may have
17        witnesses to the incident, yet counsel had not fully investigated
          them.  The court found Buckwalter was competent, sober, and
18        diligent.

19           After his Marsden motion was denied, [petitioner] told the court
          he felt the court was biased and he wanted to be tried in absentia.
20        Then he made a Faretta motion.  Although the trial court cautioned
          him about the dangers of self-representation, [petitioner] stated "I
21        would be a fool to let this man [Buckwalter] represent me . . .
          under the circumstances, Your Honor."  After the court released

22  /////

23

24  back-to-back commitments in the California Youth Authority.  (CT at 381.)

25       [10]  In People v. Marsden, 2 Cal. 3d 118 (1970), the California Supreme Court held that a
    trial court must permit a defendant seeking a substitution of counsel after the commencement of
26  the prosecution's case to specify the reasons for his request.

the partly-selected jury, he stated "We can meet out at the prison tomorrow," to consider briefing regarding *Faretta*.  The matter continued to the next day.

On March 25, 1998, the court explained he would most likely appoint Buckwalter as standby counsel.  [Petitioner] stated he understood his right to represent himself and when asked if he was freely waiving his right to an attorney, [petitioner] said "No, sir, I'm not.  I said I'm not satisfied with the attorney that I have.  And as a result I would rather represent myself than to continue with the one I have."  The court explained it had already ruled on the *Marsden* motion, and the trial court effectively invited [petitioner] to renew the motion.  The motion was denied after an *in camera* hearing, wherein Buckwalter detailed [petitioner's] refusal to cooperate with the investigator.

When the prosecutor returned to the courtroom, the court asked if there were any motions and [petitioner] stated "Yes, I would like to file a motion to represent myself based on the ruling of the *Marsden* motion."  He understood he was waiving his right to an attorney, that if he was disruptive the court could reappoint an attorney and that the court would hold [petitioner] to the rules of law.  In particular, the court told [petitioner his conduct the day before had been contemptuous, and he would not get special privileges, and in particular, his library privileges would be suspended if abused.  [Petitioner] said he had education "past the sixth grade," and could read and write "To a certain degree."  Buckwalter averred [petitioner] was competent.  After granting the request, the court appointed Buckwalter as standby counsel.  When the parties discussed resetting a trial date, the court stated "The suggestion is strong, Mr. Muhammad, and as I say, it is not a basis that the Court can act on, that your effort in this case has been solely to delay and to obstruct this trial.  That is a, there is a strong suggestion, and the Court entertains a high suspicion that that is the purpose, but I have set it."

(*People v. Barnum*, slip op., at 25-27.)  The California Court of Appeal then rejected petitioner's argument, stating "this is a typical case where an experienced felon tries to inject reversible error into the case by juggling *Marsden* and *Faretta* motions."  (Id., at 27.)  The Court continued:

Nothing in the record suggests relevant witnesses went unquestioned.  Although appellate counsel faults the trial court's 'misapprehension of the nature of [petitioner's] complaint,' it is clear the trial court considered [petitioner's] complaints about counsel, elicited an adequate response, and denied the motion.  The heart of [petitioner's] complaint was Buckwalter was drunk and incompetent, and Buckwalter refuted that view.  [Petitioner] did mention his personal wish that the entire tier of prisoners be contacted, but we cannot say on this record counsel was required to

19

interview them.  The trial court noted that for ethical reasons it was preferable for the investigator to talk to possible witnesses first, but since [petitioner] and his cellmate did not cooperate, this had not been done.  It was not enough for [petitioner] to say some of the prisoners may have seen something and therefore counsel had to question them all.

[Petitioner] urges we must review the matter *de novo*, relying on cases involving conflicts of interest in civil cases.  We review the ruling for abuse of discretion.  "'Denial of the motion is not an abuse of discretion unless the [petitioner] has shown that a failure to replace the appointed attorney would "substantially impair" the [petitioner's] right to assistance of counsel.'"  (*People v. Horton* (1996) 11 Cal. 4th 1068, 1102.)  [Petitioner] has not demonstrated an abuse of discretion.

In the reply brief [petitioner] claims that because his investigator located witnesses while [petitioner] represented himself, the trial court's ruling "was unsupported by the evidence and an abuse of discretion."  Not so.  We review the ruling based on the then-known facts, not later developments.  Presumably, [petitioner] did not impede his own investigation in the same way he impeded appointed counsel's.

(People v. Barnum, slip op., at 27-28.)

The Sixth Amendment to the Constitution guarantees the right to the assistance of counsel in a criminal prosecution.  Such assistance must be effective and competent.  Strickland v. Washington, 466 U.S. 668 (1984).  Where a defendant is proceeding with the assistance of counsel, he may move to dismiss or substitute counsel, whether appointed or retained.  The grant or denial of such a motion may depend on its timeliness and the nature of the conflict between the defendant and current counsel.  United States v. McClendon, 782 F.2d 785, 789 (9th Cir. 1986).  In assessing a federal trial court's decision to deny a motion to substitute counsel on direct appeal, the court looks at three factors:  "'(1) timeliness of the motion to dismiss counsel; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.'"  Id. (quoting United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979)).  See also, United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000).  A denial of a motion for substitution of counsel on the first day of trial will be upheld where

there is insufficient showing of conflict with current counsel.  McClendon, 782 F.2d at 789.

Additionally, it is within a trial judge's discretion to deny a motion to substitute made on the eve

of trial if the substitution would require a continuance.  Id.

However, the Ninth Circuit Court Appeals has ruled that in assessing such a claim

in the context of a § 2254 proceeding such as this, the focus is different than that on direct

review.  In Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc) the court stated:

> Our primary reason for accepting this case for en banc review was
> to correct the standard of review we have been using to examine
> the constitutionality of a state court's handling of a motion to
> substitute appointed counsel based on allegations of an
> irreconcilable conflict.  In Bland, we said that the test is whether a
> state court's denial of such a motion was for an "abuse of
> discretion."  Bland, 20 F.3d at 1475.
>
> * * *
>
> [O]ur only concern when reviewing the constitutionality of a state-
> court conviction is whether the petitioner is "in custody in
> violation of the Constitution or laws or treaties of the United
> States."  28 U.S.C. § 2254(a).  See also Coleman v. Thompson,
> 501 U.S. 722, 730 (1991) ("The [habeas] court does not review a
> judgment but the lawfulness of the petitioner's custody
> simpliciter.") (emphasis in original).  A particular abuse of
> discretion by a state court may amount also to a violation of the
> Constitution, but not every state court abuse of discretion has the
> same effect.  Accordingly, to the extent that they conflict with this
> opinion, we overrule Bland and Crandell v. Bunnell, 144 F.3d
> 1213 (9th Cir. 1998).

Id. at 1024-25 (footnotes omitted).

In Schell the court determined that it was "well established and clear that the Sixth

Amendment requires on the record an appropriate inquiry into the grounds of such a motion, and

that the matter be resolved on the merits before the case goes forward."  Id., 218 F.3d at 1025.

See also Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("Thus, the state trial court's

summary denial of a defendant's motion for new counsel without further inquiry violated the

Sixth Amendment.")

/////

21

1      Under such an inquiry the state trial court's handling of the motion to substitute

2 appointed counsel in this case passes constitutional muster.  Petitioner was given a full

3 opportunity to air his complaints about counsel's performance.  The trial court entertained three

4 Marsden motions (one on March 24, 1998 and two on March 25, 1998) and allowed petitioner

5 the opportunity to fully explain his position regarding his counsel on the record.  At each hearing,

6 the court focused on and fully explored the nature of the conflicts, as expressed by petitioner.

7 Petitioner alleges that the trial court misunderstood "the nature of petitioner's complaint that his

8 counsel had performed no investigation."  (Traverse at 2.)  However, the record does not support

9 such a finding.  The undersigned finds that the trial court made an adequate inquiry into

10 petitioner's complaints and resolved the matter on the merits before proceeding with the case.

11      Moreover, even under the prior "abuse of discretion" standard of review, it

12 appears that the state trial court's resolution of the motions was appropriate.  The transcripts from

13 the *in camera* hearings do not reflect that the trial court abused its discretion in denying

14 petitioner's Marsden motions.  The trial court found that petitioner's defense counsel had hired

15 an investigator who attempted to interview percipient witnesses in prison, but the witnesses

16 refused to be interviewed.  (March 24, 1998 Marsden Hearing Transcript at 8.)  The trial court

17 also made a credibility determination that defense counsel had appeared "competent, . . . sober

18 and to understand where he is, what he is doing, and what the case is all about."  (Id.)  In

19 addition, however, the trial court agreed to have Mr. Hendricks called in that afternoon so that

20 petitioner and or his standby counsel could interview him to determine whether he should be

21 called as a witness at trial.  (Id. at 5.)

22      Petitioner repeated his concerns about defense counsel on March 25, 1998 at 9:00

23 a.m.  The trial court again found defense counsel had been sober and competent to act as

24 petitioner's attorney.  (March 25, 1998 Marsden Hearing Transcript at 2.)  Petitioner then stated

25 defense counsel had lied to the court about witnesses refusing to be interviewed.  (Id. at 3.)

26 Defense counsel presented the court with a copy of Mr. Abbott's investigation report which

1    confirmed Mr. Hendricks declined to speak with Mr. Abbott.  (Id. at 4.)  Defense counsel stated

2    he had explained to petitioner that defense counsel could not be the investigator because it could

3    make him a witness in the case.  (Id.)  Defense counsel said petitioner wanted counsel to find out

4    the names of the inmates on the tier and interview them to see whether they had witnessed the

5    altercation at issue.  (Id. at 5.)  But defense counsel reiterated that this investigation needed to be

6    performed by the investigator and because petitioner would not cooperate with the investigator, it

7    was not done.  (Id.)   Petitioner conceded he had had a falling out with the investigator, but

8    claimed he had talked to the investigator and that Mr. Hendricks had talked to the investigator.

9    (Id. at 6.)

10               The trial court found that the

11               reluctance of the [petitioner] and/or of his witnesses to cooperate
                 with the defense investigation is not the fault of [defense counsel],
12               and under those circumstances it clearly appears to be the activity
                 by the [petitioner] and/or his witnesses of refusal to cooperate. . . .
13               Hendricks' report appears to be an unqualified refusal to cooperate.
                 He said quote, I have nothing to say.  He can't be compelled to
14               testify in this matter as I believe Mr. Hendricks is also a Defendant
                 in the case. . . .

15

16    (Id. at 7.)  The trial court continued:

17               It does appear to the Court and would be the conclusion of the
                 Court that the effort in this case is to boot strap [petitioner] into
18               possible error by putting the Court in an untenable situation, but I
                 find no actual basis for a conflict between [defense counsel] or his
19               client in this matter, except that generated by [defense counsel's]
                 client and possibly the alleged witnesses.
20    (Id. at 7-8.)

21               At 3:00 p.m. on March 25, 1998, after petitioner had moved to be tried in absentia

22    and the jury had been discharged because petitioner invoked his Faretta rights, the trial court

23    entertained yet another Marsden motion, partially because petitioner was equivocal when asked

24    whether he freely and voluntarily waived his right to an attorney.  (Reporter's Supplemental

25    Transcript on Appeal, March 25, 1998, at 22-25.)  Petitioner stated he was not satisfied with his

26    attorney and, "as a result, [he] would rather represent [himself] than to continue with the one [he

1   had]." (Id. at 23.)  At that point, the trial court reiterated its findings that defense counsel was "a

2   competent and experienced lawyer" and was "sober and competent to act as counsel."  (Id.)

3   Petitioner stated if he had to continue with defense counsel's representation, petitioner would

4   rather defend himself.  (Id.)[11]

5           The court inquired of petitioner whether he understood he was giving up his right

6   to be represented by an attorney and petitioner stated he did.  (Id. at 25.)  Petitioner was informed

7   he would have to comply with the rules, procedure and substantive law even though he would be

8   representing himself.  (Id.)  The trial court explained that it would not be able to assist petitioner

9   on matters of law, evidence or trial practice.  (Id. at 27.)

10          The trial court then confirmed with petitioner that he gave up his right to be

11  represented by defense counsel and chose to act as his own attorney.  (Id. at 28.)  The prosecution

12  expressed its concern that petitioner felt he was forced to act as his own attorney based on the

13  court's denial of the Marsden motion.  (Id.)  The trial court responded that petitioner had a

14  constitutional right to represent himself under Faretta and appointed defense counsel to serve as

15  standby counsel.  (Id. at 28-29.)

16          Petitioner asked why different counsel could not be appointed as standby.  (Id. at

17  29-30.)  The trial court responded:

18          Because I see no basis to appoint another attorney, because of your
            refusal to get along.  Any disagreement you have in this case
19          appears to this Court and is the finding of the Court is one
            generated by you and/or your witnesses, and the Court cannot
20          appoint other counsel.

21  (Id. at 30.)  Later, when attempting to set the matter for trial, the trial court again remarked that

22  petitioner's "effort in this case [had] been to delay and to obstruct this trial."  (Id. at 31.)

23  ─────────────────

24      [11]  There is no page 24 in the Faretta motion transcript.  The text at the bottom of page 23
        and the top of page 25 do not flow, so it does not appear to be an issue of pagination.  Upon
25      further inquiry, the court reporter explained that the Faretta motion had been interrupted by a
        Marsden motion, prepared under separate sealed cover, and then resumed the Faretta motion on
        page 25.  (See June 7, 2007 Decl.)  The Clerk's Transcript reflects that the Faretta motion was
26      interrupted by a Marsden motion, which was denied.  (CT 161.)

1    On this record, the court cannot find that the trial court abused its discretion in

2  denying petitioner's <u>Marsden</u> motion.

3    Finally, this court is unable to find that the conflict between petitioner and his

4  counsel prevented effective assistance of counsel.  The court has reviewed the record and agrees

5  with the California Third Appellate District Court of Appeal that petitioner put on a valiant

6  defense effort.  <u>People v. Barnum</u>, slip op. 23-24.  Moreover, petitioner presented no specific

7  facts or evidence to refute the trial court's finding that petitioner and/or his witnesses contributed

8  to the conflict.  <u>Schell</u>, 218 F.3d at 1027.

9    Accordingly, petitioner's third claim should be denied.

10    D.  <u>Refusal to Review Discovery Material *In Camera*</u>

11    Petitioner claims that his right to due process was violated by the trial court's

12  refusal to review certain discovery material *in camera*.  Petitioner wanted to learn if there had

13  been similar complaints of abuse by these guards, which information 'would be used by the

14  defense to locate and call witnesses to testify that these officers have a character trait, habit, and

15  custom for engaging in excessive and illegal force.'"  (<u>People v. Barnum</u>, slip op. at 29.)

16  Petitioner contends his <u>Pitchess</u>[12] motion was dismissed as a fishing expedition and because

17  petitioner had failed to attach an arrest report to his motion.  (Traverse at 8.)

18    The state appellate court rejected petitioner's claim, disputing petitioner's

19  characterization of the trial court's denial of the motion:

20    In context, the trial court ruled:  (1) the motion was procedurally
      deficient, as [petitioner] himself admitted and (2) the factual basis
21    supporting the motion was deficient.  [Petitioner's] claim that the
      Attorney General, representing the Department of Corrections, did
22

---

23    [12] <u>Pitchess v. Superior Court</u> (1974) 11 Cal.3d 531.  Under <u>Pitchess</u>, petitioner must
    show "general allegations which establish some cause for discovery other than 'a mere desire for
24    the benefit of all information which has been obtained by the People in their investigation of the
    crime.'"  <u>Id.</u> at 536-37.  "Affidavits showing good cause for the discovery or disclosure sought,
25    setting forth the materiality thereof to the subject matter involved in the pending litigation"
    (Evid. Code Section 1043, subd. (b)(3)) are required and arrest reports must be attached (Evid.
26    Code Section 1046).

not attack the motion on this procedural ground, is belied by the record.  The fact the Attorney General also addressed the merits does not mean he dropped his procedural objections.

[Petitioner] was entitled to no exemption from procedural rules, simply because he elected to represent himself.  (*Doran v. Dryer* (1956) 143 Cal. App. 2d 289, 290; see part II, *ante*.)

To the extent [petitioner] recouches his claim as a denial of due process, it is not clear his motion was predicated on due process and in any event a litigant cannot incant "due process" and thereby evade neutral procedural rules.  (See, e.g., *People v. Staten* (2000) 24 Cal. 4th 434, 451, fn. 2.)

(People v. Barnum, slip op. at 30-31.)

Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

Petitioner has failed to provide any factual support for this claim; rather, he argues only that the trial court used the wrong standard, requiring petitioner to show the discovery was necessary, rather than finding petitioner's Pitchess declaration was sufficient to warrant an *in camera* review of the personnel records.  (Petition at 6.)  In his traverse, petitioner focuses on the deficient procedural aspect of the motion and claims it was denied primarily because petitioner lacked legal knowledge.  (Traverse at 8.)  Petitioner has failed to demonstrate the denial of the Pitchess motion rendered his trial fundamentally unfair.  Petitioner's fourth claim should be denied.

E.  Prosecutorial Misconduct

Finally, petitioner claims that his constitutional rights were violated by prosecutorial misconduct.  Specifically, petitioner states: "Prosecutor suggested a negative

/////

26

1   inference should be drawn based on petitioner's pretrial assertion of his right to remain silent.[13]

2   Calling [petitioner] as witness in prosecution rebuttal case violated petitioner's constitutional

3   privilege against self-incrimination and right not to testify." (Petition at 6(b).)  Petitioner alleges

4   the prosecution "took advantage of petitioner's lack of legal acumen. "  (Traverse at 8.)

5          Respondent argues that this claim was not presented to the California Supreme

6   Court and is barred by the state court's finding that petitioner's failure to object or request an

7   admonition at trial bars its consideration on collateral review.  (Answer at 11.)

8          The state Court of Appeal found petitioner had waived this claim:

9          [N]o objections or requests for admonitions were made in the trial
           court and none of the claims were of the sort not curable by an
10         admonition, even if they were sound.  They are all waived.  *People
           v. Montiel*, (1993) 5 Cal.4th 877, 914.  They amount to a showing
11         [petitioner] made a poor choice of counsel, i.e., he should not have
           made a *Faretta* motion.

12

13  (People v. Barnum, slip op. at 31-32.)

14          A criminal defendant's due process rights are violated if prosecutorial misconduct

15  renders a trial fundamentally unfair.  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)

16  (quoting Darden v. Wainwright, 477 U.S. 168, 183 (1986)).  According to the Supreme Court,

17  "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

18  fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219

19  (1982).  Thus, the federal habeas court must distinguish between "ordinary trial error of a

20  prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional

21  due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974).  See also Johnson v.

22  Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  In order to determine whether a prosecutor engaged in

23  misconduct, it is necessary to examine the entire proceedings and place the prosecutor's remarks

24  in context.  See United States v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment

25  

26          [13] Petitioner did not provide a record cite for this alleged comment and the court has not
        found one.  (RT 354-65; 375-76.)

27

1   must be examined in context. . . ."); Greer v. Miller, 483 U.S. 756, 765-66 (1987); Williams v.

2   Borg, 139 F.3d 737, 745 (9th Cir. 1998).  Relief on such claims is limited to cases in which the

3   petitioner can establish that prosecutorial misconduct resulted in actual prejudice.  Johnson, 63

4   F.3d at 930 (citing Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477

5   U.S. at 181-83.   In this vein, prosecutorial misconduct violates due process when it has a

6   substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-

7   Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

8           Petitioner has failed to demonstrate that his trial was rendered fundamentally

9   unfair or unreliable because of his failure to object or failure to request an admonishment or

10  limiting instruction.  This court cannot find that petitioner's failures worked to petitioner's actual

11  and substantial disadvantage, infecting his entire trial with errors of constitutional dimension.

12  Accordingly, the procedural default in state court precludes this court's review of the merits of

13  this issue.  See Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977) (collateral relief on habeas

14  barred unless petitioner meets "cause and prejudice" standard for failure to raise objection in trial

15  court); Rich v. Calderon, 187 F. 3d 1064, 1069 (9th Cir. 1999), cert. denied, 528 U.S. 1092

16  (2000) ("We may not review his six other prosecutorial misconduct claims because [petitioner]

17  procedurally defaulted by failing to make contemporaneous objections, and the California court

18  consequently invoked a procedural bar to their consideration, the validity of which *Rich* has

19  failed to overcome"); Huerta v. Estelle, 7 F. 3d 139 (9th Cir. 1993) (same).

20          This court finds that the ruling by the California Court of Appeal on the

21  procedural default issue did not result in a decision that was contrary to, or involved an

22  unreasonable application of, clearly established federal law.  Thus, petitioner's fifth claim is

23  procedurally barred.

24          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

25  writ of habeas corpus be denied.

26  /////

28

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

6    failure to file objections within the specified time may waive the right to appeal the District

7    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8    DATED: June 8, 2007.

9

10    UNITED STATES MAGISTRATE JUDGE

11

12    /001;barn1385.157

13

14

15

16

17

18

19

20

21

22

23

24

25

26